JANVIER, Judge.
Mrs. John H. Young sustained physical injuries as the result of being thrown from the rear seat into the meter and the báck of the front seat of a taxicab in which she was a passenger when the cab was brought to a sudden stop by the driver. She and her husband brought this suit for damages against Toye Bros. Yellow Cab Company, a partnership, and the individual members thereof. Mrs. Young prayed-for judgment for $55,000-as compensation for her physical injuries, pain and suffering, mental shock and anguish, embarassment and humiliation, and impairment of her eyesight and loss of her teeth. Mr. Young sought judgment for $8,098.25 for his “loss.of consortium,” medical and hospital bills, cost of nurses, and loss of his wife’s “wages and income”.
The plaintiffs charge that, as the cab was being driven out Canal Street in the direction of the lake, the driver, A. J. Geraci, without apparent cause, suddenly “came to a violent, unreasonable and unwarranted stop,” and that as a result Mrs. Young was thrown from her seat and sustained the injuries on which this suit is based.
The defendants, admitting thé occurrence of the accident, and that at the time Mrs. Young was a passenger for hire, denied that the driver of the cab was guilty of any negligence and especially averred that the cab had been brought to a stop as the result of, a sudden emergency created by the operator of another automobile which, *108 while traveling alongside the cab, was “swerved suddenly to the left- directly in front of the said taxicab.”
In the Civil District Court for the Parish of Orleans there was judgment dismissing the suit of the plaintiffs, and they have appealed.
There is no dispute over the law applicable. When a passenger for hire in a public conveyance sustains injitries as- the result of an accident the cause of which is not known to the passenger, the burden of explaining the accident and of showing that it did not occur as the result of negligence on the part of those in charge of the vehicle is on the carrier. Since the law applicable to such a situation as is found here is clearly set forth in Wallace v. Shreveport Rys. Co., La.App., 175 So. 86, 87, cited by counsel for plaintiffs, we quote briefly from the decision of our Brothers of the Second Circuit in that case. There, as here, there were only two eyewitnesses, the operator of the vehicle and the plaintiff who was the passenger. They gave divergent versions of the occurrence. The Court of 'Appeal said:
“ * * * A question of law, however, arises from the virtually admitted fact that plaintiff did fall and was injured while riding on defendant’s car as a paid passenger. * * * If plaintiff’s testimony stood alone, she would be entitled to judgment, * * * The onus of proof, after the prima facie showing, strictly speaking, did not shift, but it did then devolve upon defendant to adduce proof of lack of negligence on its part sufficient in probative weight to overcome plaintiff’s case, * * ¡(S ”
The Court noted the fact that there were only two witnesses and that they gave statements which could not be reconciled, the one with the other, and said:
“ * *' * Ordinarily, in such circumstances, a plaintiff would be held to have failed to make out his case, but not so when a breach of a contract of carriage is involved.”
Counsel for plaintiff confidently assert that the defendants have' not produced proof of lack of negligence of sufficient probative weight to overcome the effect of the occurrence of an accident in which a passenger sustained injury.
Geraci, the operator of the taxicab, says that he had “picked up” Mrs. Young as a passenger in front of a Canal Street department store and had proceeded out Canal Street and had gone about five or six blocks alongside the neutral ground when, on. approaching the intersection of North Liberty Street, he noticed that the traffic light facing him at that intersection was red. He says that he reduced, the speed of the cab when he was about 60 or 75 feet from the corner at which another car was standing ahead of him, apparently waiting for the light to change, and that .when he was about 40 or 50 feet from this car, which ■was standing in the roadway ahead of him, a third car which had been. alongside his cab on its right “suddenly cut over in front” of the taxicab and he says: “I had to slam on my brakes.” The veracity of this witness is vigorously attacked by counsel for plaintiffs who rely on certain variations in the several statements made by him, and contend that these variations evidence untruthfulness on his part, or at least indicate that his testimony cannot be relied on. For instance, counsel say that at one part in the testimony of this witness, he said that the roadway ahead of him was clear, whereas at another part he referred to a car which had been standing at the intersection ahead of him waiting for the light to change.
Counsel also point out that at one part of the testimony of this witness he had said that the third car which was on his right had been almost even with the cab when he first noticed it, its front being only a few feet in advance of the front of the taxicab, whereas at another point in his testimony he said that when he first noticed -this other car, the taxicab was 40 or 50 feet from the stationary car and the third car was entirely ahead of the taxicab when it suddenly swerved to its left.
It is true that as a result of a gruelling cross-examination, Geraci did, in certain *109 particulars, slightly vary his original story, going so far as to say that two of his original statements were wrong. However, a careful analysis' of his entire testimony convinces us that he earnestly endeavored to tell the truth about the occurrence, and that the changes which he made in his lengthy testimony resulted entirely from his ' willingness to admit slight discrepancies, which in fact were of no importance. For instance, when he said that the road ahead of him was clear and later said that there was another car standing about 60 to 75 feet ahead waiting for the light to change, he obviously meant that there was no vehicle ahead of him which caused him to stop or to reduce his speed during the five or six blocks between the point at which he had picked up Mrs. Young and the intersection at which the accident occurred when, for the first time, he noticed the standing automobile at the intersection.
Nor do we see anything to evidence untruthfulness in the slight variations in his statement concerning the other car which he said cut in front of him. At one point he said that the car had cut in front of him when its front was only a few feet ahead of the front of his cab and later he said that when it cut in front of him the entire car was ahead of his taxicab. Both vehicles were moving; one was passing the other. In such a situation it would require mechanical precision and accuracy to be able to remember and to describe the exact relative positions of the two cars as they approached the spot at which one ultimately •cut in front of the other.
But although we see nothing in the testimony of Geraci which indicates that he .intentionally or even inadvertently gave statements which were incorrect, we cannot say the same of the testimony given by Mrs. Young. It is interesting to note that in the petition it is alleged that the cab was brought to a violent stop “suddenly without apparent cause, and without reason,” and that in the petition not one word is said about the cab having been driven into the intersection in the face of a red light, nor is there in the petition a single word to indicate that another vehicle was crossing the intersection, and that it was due to this crossing of the other vehicle that the cab was brought to a stop'. We say that it is interesting to note 'that nothing is Said about these occurrences since obviously the information as to how the accident occurred must have been obtained by counsel for plaintiffs from Mrs. Young, and yet when Mrs. Young was on the witness stand she suddenly and to the surprise of her attorneys as well as to the surprise of the Court and other counsel made the statement that the cab was brought to a sudden stop because another vehicle was crossing the intersection and Géraci, noticing it for the first time and noticing that the light facing him was red, suddenly brought the taxicab to a stop.
Mrs. Young was asked why she had not told anyone about the other vehicle which was crossing the intersection; and she said that she had never told anyone, any member of her family, nor her attorneys about that until she told it on the witness stand for the first time to the judge, and that this was because she did not want. to hurt Geraci, the driver of the cab.
It is also most interesting to note that a few days after the occurrence of the accident Mrs. Young, at a time when she admits that she was feeling “pretty good”, signed a statement, concerning the accident and that this statement in every detail corroborated the statement made by the driver of the taxicab. The important part of the statement reads as follows:
“On Friday, May 12, 1950 about 4:45 p. m. I was in a Yellow Cab. I got into the cab at D. H. Holmes store and was on my way home. The cab was travelling out Canal St. As the cab was coming to a light a new car cut in front of the cab causing the cab to stop short or hit the car so the driver stopped short and I was thrown forward from the cab seat onto the cab floor and struck my .head on the cab partition, on the iron rail by the meter. *110 The cab driver helped me hack to the seat. He was most courteous to me. He took me up to Baptist Hospital. They kept us at the hospital for 45 minutes before they came to assist me. I wanted to go to Touro Infirmary where I am employed.
♦ * * * * *
“I would say that the driver of the other car was the cause of what happened, the cab had a clear roadway and this car cut in front of the cab.”
Of course, as is usual in such a situation, Mrs. Young being confronted with that statement found it necessary to explain why, on the witness stand, she told an entirely different story. She admitted that she had signed the statement and did not deny that it had been read to her. But she apparently attempted to create the impression that she did not know what was in the statement because she said that when she had signed it, she had been using some glasses which she had obtained from some one named Fellman who, she thought, was an eye “doctor” and that later she learned that this man was not an “eye doctor”, and then realized that she could not read with those glasses.
“Q. Do you remember reading this statement there before you signed it? A. I couldn’t see. You can’t blame me. With the glasses that Mr. Fell-man gave to me — I didn’t know that he wasn’t a doctor; I didn’t know that until after I got well. I thought he was a — what do you call an eye doctor?
“The Court: Q. You thought he was an oculist and he wasn’t that? A. I thought so and he wasn’t. * * * ”
The absurdity of this statement is evident.
We note that in Gonzales v. Toye Bros. Yellow Cab Co., La.App., 198 So. 379, 381, the passengers who were in the cab made statements favorable to the chauffeur of the cab and later gave testimony which was unfavorable. We commented on this situation, saying:
“There is also evidence which leads to the conclusion that the two ladies, after the accident, and before they had given thought to the possibility of financial recovery, made statements in praise of the action of the chauffeur and exonerating him from blame. * * sjs »
There are numerous other facts which throw the gravest suspicion on the testimony of Mrs. Young, but we deem it necessary to do more than to comment on the tremendous exaggeration of the injuries which it is claimed Mrs. Young sustained. She claims $9,500 for “impairment of eyesight and loss of teeth,” whereas the record convinces us that the teeth which she lost were removed as the result of pyhorrea; that no real damage to the teeth or to the eyes was sustained as the result of the accident.
It is unnecessary to say more than that the record convinces us, as it did the trial judge, that the accident was caused entirely by the fact that a third car suddenly and unexpectedly dashed in front of the taxicab in which Mrs. Young was a passenger and that the driver of the taxicab, Geraci, brought it to a sudden stop in a sudden emergency to avoid what appeared to be. an impending collision. Under such circumstances there is no liability in the defendants.
In Green v. Baton Rouge Bus Co., La. App., 66 So.2d 344, 347, the Court of Appeal for the First Circuit held a bus company to be without liability in a case in which a passenger was thrown from the seat to the floor when the bus was brought to a sudden stop to avoid an impending collision with a truck which had suddenly turned in front of the bus. The Court said:
“Our jurisprudence, while it holds a public carrier to the exercise of the highest degree of care, does not make it an absolute insurer of the safety of its passengers. Consequently, while the burden of proof is upon the carrier to show itself free from fault, the carrier’s liability is based upon negligence, *111 and if it appears that there was no negligence whatsoever upon the part of the carrier there is no liability.
“In Gross v. Teche Lines, Inc., 207 La. 354, 21 So.2d 378, 382, the facts disclose the plaintiff was a passenger on a bus which was involved in a head-on collision with a truck proceeding in the opposite direction from the bus. The truck had swerved out of its line of traffic to the left hand lane to pass a vehicle immediately ahead of it, and an emergency was presented. The Supreme Court found the driver of the bus was not guilty of any negligence, using the language following:
“ ‘It is well settled that the driver of a motor vehicle is not negligent in failing to anticipate that another car operator, who is lawfully and prudently driving, will suddenly disregard the traffic laws and become reckless when there is nothing in his conduct to indicate he will do so. * * * ’ ”
We said in Wayne v. New Orleans Public Service, Inc., La.App., 52 So.2d 55, 57:
“It is well settled under our jurisprudence that the ‘emergency doctrine’ applies to public carriers of passengers for hire and will serve to exculpate them from situations where emergencies have arisen through no fault of theirs and accidents ensue.”
See, also, Oppenheim v. Toye Bros. Yellow Cab Co., La.App., 7 So.2d 420, 424, in which we said:
“It is well established that there is no liability in a public carrier where the accident results from an emergency created entirely by causes for which the carrier is not responsible. * * * ”
The judgment appealed from is affirmed at the cost of appellants.
Affirmed.